2/26/2020 12:25:05 PM

# Compare Results

| Old File: | | New File: |
|---|---|---|
| **18-935.pdf** | versus | **18-935_new.pdf** |
| **27 pages (167 KB)** | | **27 pages (171 KB)** |
| 2/24/2020 8:49:11 AM | | 2/26/2020 12:18:39 PM |

**Total Changes**

**1**

**Content**

0   Replacements

0   Insertions

0   Deletions

**Styling and Annotations**

1   Styling

0   Annotations

Go to First Change (page 24)

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MONASKY *v.* TAGLIERI

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 18–935. Argued December 11, 2019—Decided February 25, 2020

The Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention or Convention), implemented in the United States by the International Child Abduction Remedies Act, 22 U. S. C. §9001 *et seq.,* provides that a child wrongfully removed from her country of "habitual residence" ordinarily must be returned to that country.

Petitioner Monasky, a U. S. citizen, asserts that her Italian husband, respondent Taglieri, became abusive after the couple moved to Italy from the United States. Two months after the birth of the couple's daughter, A. M. T., in Italy, Monasky fled with the infant to Ohio. Taglieri petitioned the U. S. District Court for the Northern District of Ohio for A. M. T.'s return to Italy under the Convention, pursuant to 22 U. S. C. §9003(b), on the ground that the child had been wrongfully removed from her country of "habitual residence." The District Court granted Taglieri's petition, concluding that the parents' shared intent was for their daughter to live in Italy. Then two-year-old A. M. T. was returned to Italy. The en banc Sixth Circuit affirmed. Under its precedent, the court first noted, an infant's habitual residence depends on the parents' shared intent. It then reviewed the District Court's habitual-residence determination for clear error and found none. In doing so, the court rejected Monasky's argument that Italy could not qualify as A. M. T.'s "habitual residence" in the absence of an actual agreement by her parents to raise her there.

*Held*:

1. A child's habitual residence depends on the totality of the circumstances specific to the case, not on categorical requirements such as an actual agreement between the parents. Pp. 7–14.

(a) The inquiry begins with the Convention's text "and the context

in which the written words are used." *Air France* v. *Saks*, 470 U. S. 392, 397. The Convention does not define "habitual residence," but, as the Convention's text and explanatory report indicate, a child habitually resides where she is at home. This fact-driven inquiry must be "sensitive to the unique circumstances of the case and informed by common sense." *Redmond* v. *Redmond*, 724 F. 3d 729, 744. Acclimation of older children and the intentions and circumstances of caregiving parents are relevant considerations, but no single fact is dispositive across all cases. The treaty's "negotiation and drafting history" corroborates that habitual residence depends on the specific circumstances of the particular case. *Medellín* v. *Texas*, 552 U. S. 491, 507. This interpretation also aligns with habitual-residence determinations made by other nations party to the Convention. Pp. 7–12.

(b) Monasky's arguments in favor of an actual-agreement requirement are unpersuasive. While an infant's "mere physical presence" is not a dispositive indicator of an infant's habitual residence, a wide range of facts other than an actual agreement, including those indicating that the parents have made their home in a particular place, can enable a trier to determine whether an infant's residence has the quality of being "habitual." Nor is adjudicating a dispute over whether an agreement existed a more expeditious way of promoting returns of abducted children and deterring would-be abductors than according courts leeway to consider all the circumstances. Finally, imposing a categorical actual-agreement requirement is unlikely to be an appropriate solution to the serious problem of protecting children born into domestic violence, for it would leave many infants without a habitual residence, and therefore outside the Convention's domain. Domestic violence should be an issue fully explored in the custody adjudication upon the child's return. The Convention also has a mechanism for guarding children from the harms of domestic violence: Article 13(b) allows a court to refrain from ordering a child's return to her habitual residence if "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Pp. 12–14.

2. A first-instance habitual-residence determination is subject to deferential appellate review for clear error. A trial court's habitual-residence determination presents a mixed question of law and fact that is heavily fact laden. The determination thus presents a task for fact-finding courts and should be judged on appeal by a clear-error review standard. See *U. S. Bank N. A.* v. *Village at Lakeridge, LLC*, 583 U. S. ___, ___–___. There is no "historical tradition" indicating otherwise. *Pierce* v. *Underwood*, 487 U. S. 552, 558. Clear-error review has a particular virtue in Hague Convention cases: By speeding up appeals, it serves the Convention's emphasis on expedition. Notably, courts of

Syllabus

other treaty partners also review first-instance habitual-residence determinations deferentially.  Pp. 14–16.

 3. Given the circumstances of this case, it is unnecessary to disturb the judgment below and remand the case to give the lower courts an opportunity to apply the governing totality-of-the-circumstances standard in the first instance.  Pp. 16–17.

907 F. 3d 404, affirmed.

 GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and BREYER, SOTOMAYOR, KAGAN, GORSUCH, and KAVANAUGH, JJ., joined, and in which THOMAS, J., joined as to Parts I, III, and IV.  THOMAS, J., and ALITO, J., filed opinions concurring in part and concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES
_____

No. 18–935
_____

## MICHELLE MONASKY, PETITIONER *v.* DOMENICO TAGLIERI

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[February 25, 2020]

JUSTICE GINSBURG delivered the opinion of the Court.

Under the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention or Convention), Oct. 25, 1980, T. I. A. S. No. 11670, S. Treaty Doc. No. 99–11 (Treaty Doc.), a child wrongfully removed from her country of "habitual residence" ordinarily must be returned to that country. This case concerns the standard for determining a child's "habitual residence" and the standard for reviewing that determination on appeal. The petitioner, Michelle Monasky, is a U. S. citizen who brought her infant daughter, A. M. T., to the United States from Italy after her Italian husband, Domenico Taglieri, became abusive to Monasky. Taglieri successfully petitioned the District Court for A. M. T.'s return to Italy under the Convention, and the Court of Appeals affirmed the District Court's order.

Monasky assails the District Court's determination that Italy was A. M. T.'s habitual residence. First of the questions presented: Could Italy qualify as A. M. T.'s "habitual residence" in the absence of an actual agreement by her parents to raise her there? The second question: Should the

Court of Appeals have reviewed the District Court's habitual-residence determination independently rather than deferentially? In accord with decisions of the courts of other countries party to the Convention, we hold that a child's habitual residence depends on the totality of the circumstances specific to the case. An actual agreement between the parents is not necessary to establish an infant's habitual residence. We further hold that a first-instance habitual-residence determination is subject to deferential appellate review for clear error.

## I

### A

The Hague Conference on Private International Law adopted the Hague Convention in 1980 "[t]o address the problem of international child abductions during domestic disputes." *Lozano* v. *Montoya Alvarez*, 572 U. S. 1, 4 (2014) (internal quotation marks omitted). One hundred one countries, including the United States and Italy, are Convention signatories. Hague Conference on Private Int'l Law, Convention of 25 Oct. 1980 on the Civil Aspects of Int'l Child Abduction, Status Table, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24. The International Child Abduction Remedies Act (ICARA), 102 Stat. 437, as amended, 22 U. S. C. §9001 *et seq.*, implements our Nation's obligations under the Convention. It is the Convention's core premise that "the interests of children . . . in matters relating to their custody" are best served when custody decisions are made in the child's country of "habitual residence." Convention Preamble, Treaty Doc., at 7; see *Abbott* v. *Abbott*, 560 U. S. 1, 20 (2010).

To that end, the Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides. Art. 12, Treaty Doc., at 9 (cross-referencing Art. 3, *id.*, at 7). The removal or retention is wrongful if done in violation of the

custody laws of the child's habitual residence. Art. 3, *ibid.*
The Convention recognizes certain exceptions to the return
obligation. Prime among them, a child's return is not in
order if the return would place her at a "grave risk" of harm
or otherwise in "an intolerable situation." Art. 13(*b*), *id.*,
at 10.

The Convention's return requirement is a "provisional"
remedy that fixes the forum for custody proceedings. Sil-
berman, Interpreting the Hague Abduction Convention: In
Search of a Global Jurisprudence, 38 U. C. D. L. Rev. 1049,
1054 (2005). Upon the child's return, the custody adjudica-
tion will proceed in that forum. See *ibid.* To avoid delaying
the custody proceeding, the Convention instructs contract-
ing states to "use the most expeditious procedures avail-
able" to return the child to her habitual residence. Art. 2,
Treaty Doc., at 7. See also Art. 11, *id.*, at 9 (prescribing six
weeks as normal time for return-order decisions).

B

In 2011, Monasky and Taglieri were married in the
United States. Two years later, they relocated to Italy,
where they both found work. Neither then had definite
plans to return to the United States. During their first year
in Italy, Monasky and Taglieri lived together in Milan. But
the marriage soon deteriorated. Taglieri became physically
abusive, Monasky asserts, and "forced himself upon [her]
multiple times." 907 F. 3d 404, 406 (CA6 2018) (en banc).

About a year after their move to Italy, in May 2014,
Monasky became pregnant. Taglieri thereafter took up new
employment in the town of Lugo, while Monasky, who did
not speak Italian, remained about three hours away in Mi-
lan. The long-distance separation and a difficult pregnancy
further strained their marriage. Monasky looked into re-
turning to the United States. She applied for jobs there,
asked about U. S. divorce lawyers, and obtained cost infor-
mation from moving companies. At the same time, though,

she and Taglieri made preparations to care for their ex-
pected child in Italy. They inquired about childcare options
there, made purchases needed for their baby to live in Italy,
and found a larger apartment in a Milan suburb.

Their daughter, A. M. T., was born in February 2015.
Shortly thereafter, Monasky told Taglieri that she wanted
to divorce him, a matter they had previously broached, and
that she anticipated returning to the United States. Later,
however, she agreed to join Taglieri, together with A. M. T.,
in Lugo. The parties dispute whether they reconciled while
together in that town.

On March 31, 2015, after yet another heated argument,
Monasky fled with her daughter to the Italian police and
sought shelter in a safe house. In a written statement to
the police, Monasky alleged that Taglieri had abused her
and that she feared for her life. Two weeks later, in April
2015, Monasky and two-month-old A. M. T. left Italy for
Ohio, where they moved in with Monasky's parents.

Taglieri sought recourse in the courts. With Monasky ab-
sent from the proceedings, an Italian court granted Ta-
glieri's request to terminate Monasky's parental rights, dis-
crediting her statement to the Italian police. App. 183. In
the United States, on May 15, 2015, Taglieri petitioned the
U. S. District Court for the Northern District of Ohio for the
return of A. M. T. to Italy under the Hague Convention,
pursuant to 22 U. S. C. §9003(b), on the ground that Italy
was her habitual residence.

The District Court granted Taglieri's petition after a four-
day bench trial. Sixth Circuit precedent at the time, the
District Court observed, instructed courts that a child ha-
bitually resides where the child has become "acclimatiz[ed]"
to her surroundings. App. to Pet. for Cert. 85a (quoting
*Robert* v. *Tesson*, 507 F. 3d 981, 993 (CA6 2007)). An infant,
however, is "too young" to acclimate to her surroundings.
App. to Pet. for Cert. 87a. The District Court therefore pro-
ceeded on the assumption that "the shared intent of the

[parents] is relevant in determining the habitual residence of an infant," though "particular facts and circumstances . . . might necessitate the consideration [of] other factors." *Id.*, at 97a. The shared intention of A. M. T.'s parents, the District Court found, was for their daughter to live in Italy, where the parents had established a marital home "with no definitive plan to return to the United States." *Ibid.* Even if Monasky could change A. M. T.'s habitual residence unilaterally by making plans to raise A. M. T. away from Italy, the District Court added, the evidence on that score indicated that, until the day she fled her husband, Monasky had "no definitive plans" to raise A. M. T. in the United States. *Id.*, at 98a. In line with its findings, the District Court ordered A. M. T.'s prompt return to Italy.

The Sixth Circuit and this Court denied Monasky's requests for a stay of the return order pending appeal. 907 F. 3d, at 407. In December 2016, A. M. T., nearly two years old, was returned to Italy and placed in her father's care.[1]

In the United States, Monasky's appeal of the District Court's return order proceeded. See *Chafin* v. *Chafin*, 568 U. S. 165, 180 (2013) (the return of a child under the Hague Convention does not moot an appeal of the return order). A divided three-judge panel of the Sixth Circuit affirmed the District Court's order, and a divided en banc court adhered to that disposition.

The en banc majority noted first that, after the District Court's decision, a precedential Sixth Circuit opinion, *Ahmed* v. *Ahmed*, 867 F. 3d 682 (2017), established that, as the District Court had assumed, an infant's habitual residence depends on "shared parental intent." 907 F. 3d, at

_____

[1] Taglieri represents that "[a]n order issued by the Italian court in December 2018 awarded legal custody of A. M. T., on an interim basis, to the Lugo municipality . . . with placement at [Taglieri's] residence; and provided that mother-daughter visits would continue under the plan prescribed in a court order issued earlier in 2018." Brief for Respondent 56, n. 13.

408 (quoting *Ahmed*, 867 F. 3d, at 690). The en banc majority then reviewed the District Court's habitual-residence determination for clear error and found none. Sustaining the District Court's determination that A. M. T.'s habitual residence was Italy, the majority rejected Monasky's argument that the District Court erred because "she and Taglieri never had a 'meeting of the minds' about their child's future home." 907 F. 3d, at 410.

No member of the en banc court disagreed with the majority's rejection of Monasky's proposed actual-agreement requirement. Nor did any judge maintain that Italy was not A. M. T.'s habitual residence. Judge Boggs wrote a concurring opinion adhering to the reasoning of his three-judge panel majority opinion: "[A]bsent unusual circumstances, where a child has resided exclusively in a single country, especially with both parents, that country is the child's habitual residence." *Id.*, at 411. The dissenters urged two discrete objections. Some would have reviewed the District Court's habitual-residence determination *de novo*. See *id.*, at 419 (opinion of Moore, J.). All would have remanded for the District Court to reconsider A. M. T.'s habitual residence in light of the Sixth Circuit's *Ahmed* precedent. See 907 F. 3d, at 419–420; *id.*, at 421–422 (opinion of Gibbons, J.); *id.*, at 423 (opinion of Stranch, J.).

We granted certiorari to clarify the standard for habitual residence, an important question of federal and international law, in view of differences in emphasis among the Courts of Appeals. 587 U. S. ___ (2019). Compare, *e.g.*, 907 F. 3d, at 407 (case below) (describing inquiry into the child's acclimatization as the "primary" approach), with, *e.g.*, *Mozes* v. *Mozes*, 239 F. 3d 1067, 1073–1081 (CA9 2001) (placing greater weight on the shared intentions of the parents), with, *e.g.*, *Redmond* v. *Redmond*, 724 F. 3d 729, 746 (CA7 2013) (rejecting "rigid rules, formulas, or presumptions"). Certiorari was further warranted to resolve a division in Courts of Appeals over the appropriate standard of

appellate review. Compare, *e.g.*, 907 F. 3d, at 408–409 (case below) (clear error), with, *e.g.*, *Mozes*, 239 F. 3d, at 1073 (*de novo*).

## II

The first question presented concerns the standard for habitual residence: Is an actual agreement between the parents on where to raise their child categorically necessary to establish an infant's habitual residence? We hold that the determination of habitual residence does not turn on the existence of an actual agreement.

### A

We begin with "the text of the treaty and the context in which the written words are used." *Air France* v. *Saks*, 470 U. S. 392, 397 (1985). The Hague Convention does not define the term "habitual residence." A child "resides" where she lives. See Black's Law Dictionary 1176 (5th ed. 1979). Her residence in a particular country can be deemed "habitual," however, only when her residence there is more than transitory. "Habitual" implies "[c]ustomary, usual, of the nature of a habit." *Id.*, at 640. The Hague Convention's text alone does not definitively tell us what makes a child's residence sufficiently enduring to be deemed "habitual." It surely does not say that habitual residence depends on an actual agreement between a child's parents. But the term "habitual" does suggest a fact-sensitive inquiry, not a categorical one.

The Convention's explanatory report confirms what the Convention's text suggests. The report informs that habitual residence is a concept "well-established . . . in the Hague Conference." 1980 Conférence de La Haye de droit international privé, Enlèvement d'enfants, E. Pérez-Vera,

Explanatory Report in 3 Actes et documents de la Qua-
torzième session, p. 445, ¶66 (1982) (Pérez-Vera).[2]  The re-
port refers to a child's habitual residence in fact-focused
terms: "the family and social environment in which [the
child's] life has developed."  *Id.*, at 428, ¶11.  What makes a
child's residence "habitual" is therefore "some degree of in-
tegration by the child in a social and family environment."
*OL* v. *PQ*, 2017 E. C. R. No. C–111/17, ¶42 (Judgt. of June
8); accord *Office of the Children's Lawyer* v. *Balev*, [2018] 1
S. C. R. 398, 421, ¶43, 424 D. L. R. (4th) 391, 410, ¶43
(Can.); *A* v. *A*, [2014] A. C., ¶54 (2013) (U. K.).  Accordingly,
while Federal Courts of Appeals have diverged, if only in
emphasis, in the standards they use to locate a child's ha-
bitual residence, see *supra*, at 6, they share a "common"
understanding: The place where a child is at home, at the
time of removal or retention, ranks as the child's habitual
residence.  *Karkkainen* v. *Kovalchuk*, 445 F. 3d 280, 291
(CA3 2006).

   Because locating a child's home is a fact-driven inquiry,
courts must be "sensitive to the unique circumstances of the
case and informed by common sense." *Redmond*, 724 F. 3d,
at 744.  For older children capable of acclimating to their
surroundings, courts have long recognized, facts indicating

_____

   [2] According to an analysis provided by the Department of State to the
Senate during the ratification process, the "explanatory report is recog-
nized by the [Hague] Conference as the official history and commentary
on the Convention and is a source of background on the meaning of the
provisions of the Convention."  Hague International Child Abduction
Convention; Text and Legal Analysis, 51 Fed. Reg. 10503 (1986).  The
explanatory report notes, however, that "it has not been approved by the
Conference, and it is possible that, despite the Rapporter's [*sic*] efforts to
remain objective, certain passages reflect a viewpoint which is in part
subjective."  Pérez-Vera 427–428, ¶8.  See *Abbott* v. *Abbott*, 560 U. S. 1,
19 (2010) ("We need not decide whether this Report should be given
greater weight than a scholarly commentary.").

acclimatization will be highly relevant.[3]  Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations.  No single fact, however, is dispositive across all cases.  Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence.  But suppose, for instance, that an infant lived in a country only because a caregiving parent had been coerced into remaining there.  Those circumstances should figure in the calculus.  See *Karkkainen*, 445 F. 3d, at 291 ("The inquiry into a child's habitual residence is a fact-intensive determination that cannot be reduced to a predetermined formula and necessarily varies with the circumstances of each case.").

The treaty's "negotiation and drafting history" corroborates that a child's habitual residence depends on the specific circumstances of the particular case.  *Medellín* v. *Texas*, 552 U. S. 491, 507 (2008) (noting that such history may aid treaty interpretation).  The Convention's explanatory report states that the Hague Conference regarded habitual residence as "a question of pure fact, differing in that respect from domicile."  Pérez-Vera 445, ¶66.  The Conference deliberately chose "habitual residence" for its factual character, making it the foundation for the Convention's return remedy in lieu of formal legal concepts like domicile

––––––––––

   [3] Facts courts have considered include: "a change in geography combined with the passage of an appreciable period of time," "age of the child," "immigration status of child and parent," "academic activities," "social engagements," "participation in sports programs and excursions," "meaningful connections with the people and places in the child's new country," "language proficiency," and "location of personal belongings." Federal Judicial Center, J. Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 67–68 (2d ed. 2015).

and nationality. See Anton, The Hague Convention on International Child Abduction, 30 Int'l & Comp. L. Q. 537, 544 (1981) (history of the Convention authored by the drafting commission's chairman). That choice is instructive. The signatory nations sought to afford courts charged with determining a child's habitual residence "maximum flexibility" to respond to the particular circumstances of each case. P. Beaumont & P. McEleavy, The Hague Convention on International Child Abduction 89–90 (1999) (Beaumont & McEleavy). The aim: to ensure that custody is adjudicated in what is presumptively the most appropriate forum—the country where the child is at home.

Our conclusion that a child's habitual residence depends on the particular circumstances of each case is bolstered by the views of our treaty partners. ICARA expressly recognizes "the need for uniform international interpretation of the Convention." 22 U. S. C. §9001(b)(3)(B). See *Lozano*, 572 U. S., at 13; *Abbott*, 560 U. S., at 16. The understanding that the opinions of our sister signatories to a treaty are due "considerable weight," this Court has said, has "special force" in Hague Convention cases. *Ibid.* (quoting *El Al Israel Airlines, Ltd.* v. *Tsui Yuan Tseng*, 525 U. S. 155, 176 (1999), in turn quoting *Air France*, 470 U. S., at 404). The "clear trend" among our treaty partners is to treat the determination of habitual residence as a fact-driven inquiry into the particular circumstances of the case. *Balev*, [2018] 1 S. C. R., at 423, ¶50, 424 D. L. R. (4th), at 411, ¶50.

Lady Hale wrote for the Supreme Court of the United Kingdom: A child's habitual residence "depends on numerous factors . . . with the purposes and intentions of the parents being merely one of the relevant factors. . . . The essentially factual and individual nature of the inquiry should not be glossed with legal concepts." *A*, [2014] A. C., at ¶54. The Court of Justice of the European Union, the Supreme Court of Canada, and the High Court of Australia agree.

See *OL*, 2017 E. C. R. No. C–111/17, ¶42 (the habitual residence of a child "must be established . . . taking account of all the circumstances of fact specific to each individual case"); *Balev*, [2018] 1 S. C. R., at 421, 423–430, ¶¶43, 48–71, 424 D. L. R. (4th), at 410–417, ¶¶43, 48–71 (adopting an approach to habitual residence under which "[t]he judge considers all relevant links and circumstances"); *LK* v. *Director-General, Dept. of Community Servs.*, [2009] 237 C. L. R. 582, 596, ¶35 (Austl.) ("to seek to identify a set list of criteria that bear upon where a child is habitually resident . . . would deny the simple observation that the question of habitual residence will fall for decision in a very wide range of circumstances"). Intermediate appellate courts in Hong Kong and New Zealand have similarly stated what "habitual residence" imports. See *LCYP* v. *JEK*, [2015] 4 H. K. L. R. D. 798, 809–810, ¶7.7 (H. K.); *Punter* v. *Secretary for Justice*, [2007] 1 N. Z. L. R. 40, 71, ¶130 (N. Z.). Tellingly, Monasky has not identified a single treaty partner that has adopted her actual-agreement proposal. See Tr. of Oral Arg. 9.[4]

The bottom line: There are no categorical requirements for establishing a child's habitual residence—least of all an actual-agreement requirement for infants. Monasky's pro-

---

[4] Monasky disputes that foreign courts apply a totality-of-the-circumstances standard to *infants*, as opposed to older children. In this regard, she points out, the Court of Justice of the European Union instructs that, "where 'the infant is in fact looked after by her mother,' 'it is necessary to assess the mother's integration in her social and family environment' in the relevant country." Reply Brief 5–6 (quoting *Mercredi* v. *Chaffe*, 2010 E. C. R. I–14309, I–14379, ¶55). True, a caregiving parent's ties to the country at issue are highly relevant. But the Court of Justice did not hold that the caregiver's ties are the end of the inquiry. Rather, the deciding court must "tak[e] account of *all* the circumstances of fact specific to each individual case." *Id.*, ¶56 (emphasis added) (also considering, among other factors, the infant's physical presence and duration of time in the country).

posed actual-agreement requirement is not only unsup-
ported by the Convention's text and inconsistent with
the leeway and international harmony the Convention
demands; her proposal would thwart the Convention's
"objects and purposes." *Abbott*, 560 U. S., at 20. An actual-
agreement requirement would enable a parent, by with-
holding agreement, unilaterally to block any finding of ha-
bitual residence for an infant. If adopted, the requirement
would undermine the Convention's aim to stop unilateral
decisions to remove children across international borders.
Moreover, when parents' relations are acrimonious, as is of-
ten the case in controversies arising under the Convention,
agreement can hardly be expected. In short, as the Court
of Appeals observed below, "Monasky's approach would cre-
ate a presumption of no habitual residence for infants, leav-
ing the population most vulnerable to abduction the least
protected." 907 F. 3d, at 410.

## B

Monasky counters that an actual-agreement requirement
is necessary to ensure "that an infant's mere physical pres-
ence in a country has a sufficiently settled quality to be
deemed 'habitual.'" Brief for Petitioner 32. An infant's
"mere physical presence," we agree, is not a dispositive in-
dicator of an infant's habitual residence. But a wide range
of facts other than an actual agreement, including facts in-
dicating that the parents have made their home in a partic-
ular place, can enable a trier to determine whether an in-
fant's residence in that place has the quality of being
"habitual."

Monasky also argues that a bright-line rule like her pro-
posed actual-agreement requirement would promote
prompt returns of abducted children and deter would-be ab-
ductors from "tak[ing] their chances" in the first place. *Id.*,
at 35, 38. Adjudicating a winner-takes-all evidentiary dis-
pute over whether an agreement existed, however, is

scarcely more expeditious than providing courts with lee-way to make "a quick impression gained on a panoramic view of the evidence." Beaumont & McEleavy 103 (internal quotation marks omitted). When all the circumstances are in play, would-be abductors should find it more, not less, difficult to manipulate the reality on the ground, thus impeding them from forging "artificial jurisdictional links . . . with a view to obtaining custody of a child." Pérez-Vera 428, ¶11.

Finally, Monasky and *amici curiae* raise a troublesome matter: An actual-agreement requirement, they say, is necessary to protect children born into domestic violence. Brief for Petitioner 42–44; Brief for Sanctuary for Families et al. as *Amici Curiae* 11–20. Domestic violence poses an "intractable" problem in Hague Convention cases involving care-giving parents fleeing with their children from abuse. Hale, Taking Flight—Domestic Violence and Child Abduction, 70 Current Legal Prob. 3, 11 (2017). We doubt, however, that imposing a categorical actual-agreement requirement is an appropriate solution, for it would leave many infants without a habitual residence, and therefore outside the Convention's domain. See *supra*, at 11–12. Settling the forum for adjudication of a dispute over a child's custody, of course, does not dispose of the merits of the controversy over custody. Domestic violence should be an issue fully explored in the custody adjudication upon the child's return.

The Hague Convention, we add, has a mechanism for guarding children from the harms of domestic violence: Article 13(b). See Hale, 70 Current Legal Prob., at 10–16 (on Hague Conference working group to develop a best-practices guide to the interpretation and application of Article 13(b) in cases involving domestic violence). Article 13(b), as noted *supra*, at 3, allows a court to refrain from ordering a child's return to her habitual residence if "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an

intolerable situation."    Art. 13(*b*), Treaty Doc., at 10.
Monasky raised below an Article 13(b) defense to Taglieri's
return petition.   In response, the District Court credited
Monasky's "deeply troubl[ing]" allegations of her exposure
to Taglieri's physical abuse. App. to Pet. for Cert. 105a.  But
the District Court found "no evidence" that Taglieri ever
abused A. M. T. or otherwise disregarded her well-being.
*Id.*, at 103a, 105a.  That court also followed Circuit prece-
dent disallowing consideration of psychological harm
A. M. T. might experience due to separation from her
mother.  *Id.*, at 102a.  Monasky does not challenge those
dispositions in this Court.

## III

Turning to the second question presented: What is the
appropriate standard of appellate review of an initial adju-
dicator's habitual-residence determination?   Neither the
Convention nor ICARA prescribes modes of appellate re-
view, other than the directive to act "expeditiously."  Art.
11, Treaty Doc., at 9; see Federal Judicial Center, J. Gar-
bolino, The 1980 Hague Convention on the Civil Aspects of
International Child Abduction: A Guide for Judges 162 (2d
ed. 2015) (the Convention's "emphasis on prompt disposi-
tion applies to appellate proceedings").[5]

Absent a treaty or statutory prescription, the appropriate
level of deference to a trial court's habitual-residence deter-
mination depends on whether that determination resolves
a question of law, a question of fact, or a mixed question of
law and fact.  Generally, questions of law are reviewed

---

[5] Monasky contends that only *de novo* review can satisfy "the need for
uniform international interpretation of the Convention."   22 U. S. C.
§9001(b)(3)(B).  See Brief for Petitioner 19–21.  However, ICARA's recog-
nition of the need for harmonious international interpretation is hardly
akin to the "clear statutory prescription" on the standard of appellate
review that Congress has provided "[f]or some few trial court determina-
tions."  *Pierce* v. *Underwood*, 487 U. S. 552, 558 (1988).

*de novo* and questions of fact, for clear error, while the appropriate standard of appellate review for a mixed question "depends . . . on whether answering it entails primarily legal or factual work." *U. S. Bank N. A.* v. *Village at Lakeridge, LLC*, 583 U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (slip op., at 8–9).

A child's habitual residence presents what U. S. law types a "mixed question" of law and fact—albeit barely so. *Id.*, at \_\_\_ (slip op., at 7). The inquiry begins with a legal question: What is the appropriate standard for habitual residence? Once the trial court correctly identifies the governing totality-of-the-circumstances standard, however, what remains for the court to do in applying that standard, as we explained *supra*, at 7–11, is to answer a factual question: Was the child at home in the particular country at issue? The habitual-residence determination thus presents a task for factfinding courts, not appellate courts, and should be judged on appeal by a clear-error review standard deferential to the factfinding court.

In selecting standards of appellate review, the Court has also asked whether there is "a long history of appellate practice" indicating the appropriate standard, for arriving at the standard from first principles can prove "uncommonly difficult." *Pierce* v. *Underwood*, 487 U. S. 552, 558 (1988). Although some Federal Courts of Appeals have reviewed habitual-residence determinations *de novo*, there has been no uniform, reasoned practice in this regard, nothing resembling "a historical tradition." *Ibid.* See also *supra*, at 6–7 (noting a Circuit split). Moreover, when a mixed question has a factual foundation as evident as the habitual-residence inquiry here does, there is scant cause to default to historical practice.

Clear-error review has a particular virtue in Hague Convention cases. As a deferential standard of review, clear-error review speeds up appeals and thus serves the Convention's premium on expedition. See Arts. 2, 11, Treaty Doc., at 7, 9. Notably, courts of our treaty partners review first-

instance habitual-residence determinations deferentially.
See, *e.g.*, *Balev*, [2018] 1 S. C. R., at 419, ¶38, 424 D. L. R.
(4th), at 408, ¶38; *Punter*, [2007] 1 N. Z. L. R., at 88, ¶204;
*AR* v. *RN*, [2015] UKSC 35, ¶18.

                                IV

Although agreeing with the manner in which the Court
has resolved the two questions presented, the United
States, as an *amicus curiae* supporting neither party, sug-
gests remanding to the Court of Appeals rather than affirm-
ing that court's judgment. Brief for United States as *Ami-
cus Curiae* 28. Ordinarily, we might take that course,
giving the lower courts an opportunity to apply the gov-
erning totality-of-the-circumstances standard in the first
instance.

Under the circumstances of this case, however, we decline
to disturb the judgment below. True, the lower courts
viewed A. M. T.'s situation through the lens of her parents'
shared intentions. But, after a four-day bench trial, the
District Court had before it all the facts relevant to the dis-
pute. Asked at oral argument to identify any additional fact
the District Court did not digest, counsel for the United
States offered none. Tr. of Oral Arg. 38. Monasky and Ta-
glieri agree that their dispute "requires no 'further factual
development,'" and neither party asks for a remand. Reply
Brief 22 (quoting Brief for Respondent 54).

Monasky does urge the Court to reverse if it rests
A. M. T.'s habitual residence on all relevant circumstances.
She points to her "absence of settled ties to Italy" and the
"unsettled and unstable conditions in which A. M. T. re-
sided in Italy." Reply Brief 19 (internal quotation marks
and alteration omitted). The District Court considered the
competing facts bearing on those assertions, however, in-
cluding the fraught circumstances in which the parties'
marriage unraveled. That court nevertheless found that
Monasky had sufficient ties to Italy such that "[a]rguably,

[she] was a habitual resident of Italy." App. to Pet. for Cert. 91a. And, despite the rocky state of the marriage, the District Court found beyond question that A. M. T. was born into "a marital home in Italy," one that her parents established "with no definitive plan to return to the United States." *Id.*, at 97a. Nothing in the record suggests that the District Court would appraise the facts differently on remand.

A remand would consume time when swift resolution is the Convention's objective. The instant return-order proceedings began a few months after A. M. T.'s birth. She is now five years old. The more than four-and-a-half-year duration of this litigation dwarfs the six-week target time for resolving a return-order petition. See Art. 11, Treaty Doc., at 9. Taglieri represents that custody of A. M. T. has so far been resolved only "on an interim basis," Brief for Respondent 56, n. 13, and that custody proceedings, including the matter of Monasky's parental rights, remain pending in Italy. Tr. of Oral Arg. 60–61. Given the exhaustive record before the District Court, the absence of any reason to anticipate that the District Court's judgment would change on a remand that neither party seeks, and the protraction of proceedings thus far, final judgment on A. M. T.'s return is in order.

\*    \*    \*

For the reasons stated, the judgment of the Court of Appeals for the Sixth Circuit is

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 18–935

_____

## MICHELLE MONASKY, PETITIONER *v.* DOMENICO TAGLIERI

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[February 25, 2020]

JUSTICE THOMAS, concurring in part and concurring in the judgment.

The Court correctly concludes that an actual agreement between parents is not necessary to establish the habitual residence of an infant who is too young to acclimatize.* I also agree with the Court's conclusion that the habitual-residence inquiry is intensely fact driven, requiring courts to take account of the unique circumstances of each case. I write separately, however, because I would decide this case principally on the plain meaning of the treaty's text.

I

This case requires us to interpret the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T. I. A. S. No. 11670, S. Treaty Doc. No. 99–11, as implemented by the International Child Abduction Remedies Act (ICARA), as amended, 22 U. S. C. §9001 *et seq.* Article 3 of the Convention provides that the "removal or the retention of a child is to be considered wrongful" when "it is

_____

*The Court states that we "granted certiorari to clarify the standard for habitual residence," *ante*, at 6, and the opinion contains language that may be read to apply to older children, see, *e.g., ante*, at 8–9. But the relevant question presented focuses exclusively on the habitual residence of "an infant [who] is too young to acclimate to her surroundings." Pet. for Cert. i. I would confine our analysis to that distinct question, which is the only one briefed by the parties.

in breach of rights of custody attributed to a person . . . un-
der the law of the State in which the child was habitually
resident immediately before the removal or retention" and
"at the time of removal or retention those rights were actu-
ally exercised." S. Treaty Doc. No. 99–11, at 7. Under
ICARA, a parent may petition a federal or state court to re-
turn an abducted child to the child's country of habitual res-
idence. §9003(b). ICARA does not define habitual resi-
dence; it merely states that the petitioning parent must
"establish by a preponderance of the evidence . . . that the
child has been wrongfully removed or retained within the
meaning of the Convention." §9003(e)(1)(A). The Conven-
tion also does not define the phrase.

   "'The interpretation of a treaty, like the interpretation of
a statute, begins with its text.'" *Abbott* v. *Abbott*, 560 U. S.
1, 10 (2010) (quoting *Medellín* v. *Texas*, 552 U. S. 491, 506
(2008)). The Court recognizes this fact, but it concludes
that the text only "suggests" that habitual residence is a
fact-driven inquiry, and ultimately relies on atextual
sources to "confir[m] what the Convention's text suggests."
*Ante*, at 7. In my view, the ordinary meaning of the relevant
language at the time of the treaty's enactment provides
strong evidence that the habitual-residence inquiry is in-
herently fact driven. See *Schindler Elevator Corp.* v.
*United States ex rel. Kirk*, 563 U. S. 401, 407 (2011).

   In 1980, as today, "habitual" referred to something that
was "[c]ustomary" or "usual." Black's Law Dictionary 640
(5th ed. 1979); see also 6 Oxford English Dictionary 996 (2d
ed. 1989) ("existing as a settled practice or condition; con-
stantly repeated or continued; customary"); Webster's
Third New International Dictionary 1017 (1976) (similar).
And "residence" referred to a "[p]ersonal presence at some
place of abode," Black's Law Dictionary, at 1176, "one's
usual dwelling-place," 13 Oxford English Dictionary, at
707, or "the act or fact of abiding or dwelling in a place for
some time," Webster's Third New International Dictionary,

at 1931; see also *ibid.* ("a temporary or permanent dwelling place, abode, or habitation").

These definitions demonstrate that the concept of habitual residence for a child too young to acclimatize cannot be reduced to a neat set of necessary and sufficient conditions. Answering the question of what is customary or usual, for instance, requires judges to consider a host of facts, such as the presence or absence of bank accounts and driver's licenses, the length and type of employment, and the strength and duration of other community ties. Determining whether there is a residence involves the consideration of factors such as the presence or absence of a permanent home, the duration in the country at issue, and, in some cases, an actual agreement between the parents to reside in a particular place. Accordingly, the ordinary meaning of the phrase "habitual residence" provides strong support for the conclusion that an objective agreement between the child's parents is not required. This plain meaning should serve as the primary guide for our interpretation. See *Water Splash, Inc.* v. *Menon*, 581 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 4); *Olympic Airways* v. *Husain*, 540 U. S. 644, 649 (2004).

## II

This case exemplifies the wisdom of firmly anchoring our discussion in the text before turning to the decisions of sister signatories—especially when those decisions are not contemporaneous with the treaty's passage. Here, the Court finds it meaningful that foreign courts have interpreted the phrase "habitual residence" as a fact-driven inquiry. *Ante*, at 10–11. Though a "'clear trend'" has certainly emerged in foreign courts, *ante*, at 10, this consensus appears to have developed only within the past decade.

Lady Hale of the Supreme Court of the United Kingdom noted as much in the 2013 decision cited by the Court. As she explained, for many years "the English courts [had]

been tempted to overlay the factual concept of habitual residence with legal constructs," creating legal rules that dictated a child's habitual residence. *A* v. *A*, [2014] A. C. ¶39 (2013) (U. K.); see also *id.*, ¶37. According to one commentator writing in 2001, though "academics and judges" had stressed "that the term should not be treated as a term of art and should not be complicated by technical legal requirements similar to those applicable to the concept of domicile," "in some cases these statements seem[ed] to have been pure lip-service, since many courts [were] unable to resist the temptation to 'legalise' the concept." Schuz, Habitual Residence of Children Under the Hague Child Abduction Convention—Theory and Practice, 13 Child & Family L. Q. 1, 4 (2001). Thus, until recently, "[t]he approach of many [foreign] courts [had] been to focus exclusively on the purpose of the parents in relocating," an inquiry that speaks to the legal concept of domicile. Schuz, Policy Considerations in Determining the Habitual Residence of a Child and the Relevance Of Context, 11 J. Transnat'l L. & Pol'y 101, 103 (2001) (footnote omitted).

It seems, then, that it took approximately 30 years from the time of the Convention's enactment in 1980 for foreign jurisdictions to coalesce around an interpretation of habitual residence. This relatively recent evolution brings into bold relief the risk of relying too heavily on the decisions of foreign courts in lieu of a fulsome textual analysis. Because the decisions are not contemporaneous with the treaty's passage, they do not necessarily provide the best evidence of the original understanding of the phrase. And reflexively looking to foreign courts raises the question whether this Court would have resolved this case differently had the issue been presented in 1990, 2000, or even 2010, before the clear trend emerged.

The Court attempts to sidestep this difficulty by pointing to a statement in ICARA's preamble that stresses "the need for uniform international interpretation of the Convention."

22 U. S. C. §9001(b)(3)(B); see *ante*, at 10. It should go without saying that if our independent assessment of habitual residence led to a conclusion that diverged from the emerging consensus, invocation of this prefatory language to force agreement at the expense of plain meaning would be unfounded. By relying too heavily on the judicial decisions of the treaty's other signatories, rather than on a more thorough textual analysis, we risk being persuaded to reach the popular answer, but perhaps not the correct one. In short, "we should not substitute the judgment of other courts for our own." *Abbott*, 560 U. S., at 43 (Stevens, J., dissenting); see also *Olympic Airways*, 540 U. S., at 655, n. 9.

To avoid these potential pitfalls, I would rely on the plain meaning of "habitual residence" to conclude that an actual agreement is not necessary. See *supra*, at 2–3. That conclusion is bolstered by the Convention's explanatory report. Interpretations from the courts of sister signatories, though recent, also support the conclusion because they align with the meaning of the text and our own independent judgment. Because the Court places insufficient weight on the treaty's text, I cannot join Part II of its opinion.

# SUPREME COURT OF THE UNITED STATES

No. 18–935

MICHELLE MONASKY, PETITIONER *v.*
DOMENICO TAGLIERI

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[February 25, 2020]

JUSTICE ALITO, concurring in part and concurring in the judgment.

I agree with the Court on almost all the issues in this case. Specifically, I agree (1) that analysis of the question of "habitual residence" should be based on a range of factors and should be attentive to the particular facts of each case, (2) that a child may have a habitual residence in a country without a parental agreement to that effect, (3) that our interpretation of habitual residence should take into account the interpretations of other signatory nations, (4) that a district court's decision on habitual residence is entitled to deference on appeal, and (5) that the judgment below should be affirmed. I also agree with JUSTICE THOMAS that we must independently interpret the meaning of "habitual residence."

So what does it mean? The term "habitual" is used to refer to a cluster of related concepts. It can be used to refer to things done by habit, as well as things that are "constantly repeated or continued," "usual," or "accustomed." 6 Oxford English Dictionary 996 (2d ed. 1989); see also Webster's Third New International Dictionary 1017 (1976). If taken in isolation, each of these understandings might lead to a different analysis in applying the concept of "habitual residence" under the Convention. See Hague Convention on the Civil Aspects of International Child Abduction, Oct.

25, 1980, T. I. A. S. No. 11670, S. Treaty Doc. No. 99–11. But I think the Court accurately captures what the term means under the Convention when it says that a child's habitual residence is the child's "home." *Ante*, at 8, 10, 15.

Of course the concept of "home" is also multifaceted. It can be used to signify the place where a person generally sleeps, eats, works, and engages in social and recreational activities, but it can also mean the place where a person feels most comfortable and the place to which the person has the strongest emotional ties. See 7 Oxford English Dictionary, at 322–323; Webster's Third New International Dictionary, at 1082. As best I can determine, the concept of "habitual residence" under the Convention embraces all of these meanings to some degree. If forced to try to synthesize them, I would say it means the place where the child in fact has been living for an extended period—unless that place was never regarded as more than temporary or there is another place to which the child has a strong attachment. I think this is the core of what courts have made of the concept of "habitual residence," and it appears to represent the best distillation of the various shades of meaning of the term taken in context.

So interpreted, "habitual residence" is not a pure question of fact, at least as we understand that concept in our legal system. But it does involve a heavily factual inquiry. For these reasons, I would say that the standard of review on appeal is abuse of discretion, not clear error. As a practical matter, the difference may be no more than minimal. The important point is that great deference should be afforded to the District Court's determination.