Filed 2/11/21  Minkiewitz v. Becker CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOHN MINKIEWITZ, | B299073 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. |
| v. | No. 18STHC00011) |
| TIFFANY BECKER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas Trent Lewis, Judge.  Affirmed.

Tiffany Becker, in pro. per.; and Channa Weiss for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

_____

Tiffany Becker (mother) appeals from a judgment of the Los Angeles County Superior Court granting John Minkiewitz's (father) petition under the Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, T.I.A.S. No. 11670 (Hague Convention), as implemented by the International Child Abduction Remedies Act, title 42 United States Code section 11601 et seq., to return their son, C.M., to Mexico. She contends that the trial court erred in finding Mexico to be C.M.'s country of habitual residence. As the evidence in the record reveals no clear error in the trial court's factual findings and the trial court correctly applied the Hague Convention to those facts, we affirm the judgment.

## BACKGROUND

C.M. is the seven-year-old son of mother and father.[1] C.M. was born in Santa Monica, California and both parents are United States citizens. The family lived together on their boat, which was docked in Marina del Rey. Mother and father began to equip their boat for a potential trip around the world. Father sold his properties in the United States to fund the repair to and to equip the boat for the trip.

In December 2016, the family set sail for Mexico, and, by January 2017, C.M. and his parents had set up residency on their boat while moored to the harbor in Ensenada, Baja California. Once in Ensenada, the parents enrolled C.M. in school, where he made friends and was learning Spanish. Although the family was living on their boat, they drove back and forth between

_____

[1] At the time of the petition, C.M. was five years old.

2

Ensenada and Los Angeles to receive specialized medical care.[2] They maintained insurance for cars registered in the United States so they could drive back and forth between the two countries.

Mother and father took all necessary steps to acquire the necessary permits and visas for them to reside in Mexico indefinitely. While mother and father only had temporary visas, they renewed their visas and father applied for permanent residency in Mexico. Father also had bank accounts in Mexico and the United States. The parents socialized, participated in clubs, and enjoyed various entertainment and social events in Ensenada. The family resided continuously in Ensenada from January 2017 to February 2018.

In February 2018, mother left Mexico with C.M. without father's consent and returned to California. There, mother filed a request for a domestic violence restraining order against father. Mother's request was denied for lack of personal jurisdiction over father.

In October 2018, father petitioned the trial court for the return of C.M. to his custody under the Hague Convention and title 22 United States Code section 9003(b), the International Child Abduction Remedies Act. After a multiday hearing that included extensive witness testimony from the parents and others, the trial court granted father's request, finding that C.M.'s habitual residence was Mexico. The trial court rejected mother's contentions that Ensenada was only a temporary stop for the family during a longer trip around the world. Rather, the

---

[2] C.M. received additional medical care in Ensenada, including a physical to attend school.

evidence showed that they took short trips to Ensenada and other ports beyond Ensenada, but all of their trips were in the waters adjacent to Mexico. Even "if the parties had left the United States with the idea that they were going to cruise the world, their intentions changed once they landed in Ensenada, once they establish[ed] themselves there, once they placed [C.M.] in school, and once they applied for all of the various government documents and permits they needed to remain indefinitely in Mexico."

The trial court issued its statement of decision and ordered C.M. returned to Mexico in the care, custody and control of his father. Mother appealed.

## DISCUSSION

"Adopted in 1980, the [Hague Convention] is intended to prevent 'the use of force to establish artificial jurisdictional links on an international level, with a view to obtaining custody of a child.' [Citation.] Despite the image conjured by words like 'abduction' and 'force,' the [Hague] Convention was not drafted in response to any concern about violent kidnappings by strangers. It was aimed, rather, at the 'unilateral removal or retention of children by parents, guardians or close family members.' [Citation.] Such an abductor 'rarely seeks material gain; rather, he or she will aspire to the exercise of sole care and control over a son or daughter in a new jurisdiction.' [Citation.] The preamble to the [Hague] Convention describes the signatory states as 'desiring to protect children internationally from the harmful effects of their wrongful removal or retention,' effects which are thought to follow when a child 'is taken out of the family and social environment in which its life has developed.' [Citation.] This may occur either through the 'removal [of a child] from its

4

habitual environment,' or by 'a refusal to restore a child to its own environment after a stay abroad.' " (*Mozes v. Mozes* (9th Cir. 2001) 239 F.3d 1067, 1069–1070, fns. omitted.)

"The [Hague] Convention seeks to deter those who would undertake such abductions by eliminating their primary motivation for doing so.  Since the goal of the abductor generally is 'to obtain a right of custody from the authorities of the country to which the child has been taken' [citation], the signatories to the [Hague] Convention have agreed to 'deprive his actions of any practical or juridical consequences.'  [Citation.]  To this end, when a child who was habitually residing in one signatory state is wrongfully removed to, or retained in, another, Article 12 [of the Hague Convention] provides that the latter state 'shall order the return of the child forthwith.'  [Citations.]  Further, Article 16 [of the Hague Convention] provides that 'until it has been determined that the child is not to be returned under this [Hague] Convention,' the judicial or administrative authorities of a signatory state 'shall not decide on the merits of rights of custody.' " (*Mozes v. Mozes*, *supra*, 239 F.3d at p. 1070.)  Both the United States and Mexico are contracting states to the Hague Convention.  (*Bardales v. Duarte* (2010) 181 Cal.App.4th 1262, 1270.)

After the trial court issued its statement of decision, the United States Supreme Court in *Monasky v. Taglieri* (2020) ___ U.S. ___ [140 S.Ct. 719, 727] held that the determination of a child's habitual residence depends on the totality of the circumstances specific to each case, rather than on any express agreement between the parents on where to raise their child. *Monasky*, at page 730, also held that, the "habitual-residence determination . . . presents a task for factfinding courts, not

appellate courts, and should be judged on appeal by a clear-error review standard deferential to the factfinding court." Under this standard, we may not reverse the finding of the trier of fact simply because we are convinced that we would have decided the case differently. (*Anderson v. City of Bessemer City* (1985) 470 U.S. 564, 573.) Where there are two permissible views of the evidence, the trial court's choice between them cannot be clearly erroneous. (*Ibid.*)

Mother cannot overcome this highly deferential standard of review. First and foremost, her contentions are disagreements with the trial court's findings of fact including her lack of credibility. For example, mother asserts that she and father did not intend to abandon the United States and to settle in Mexico as shown by the family's significant ties to the United States. Mother points to the fact that C.M. had health issues that required treatment in the United States and that the family maintained car insurance and driver's licenses in the United States. However, the trial court considered this evidence and still found that C.M.'s habitual residence was in Mexico based on other facts, including C.M.'s enrollment in school, the family's continuous residence in Mexico for over a year, and their participation in the local community. Moreover, to the extent the family maintained ties to the United States through bank accounts and mailing addresses, the trial court found that these were common practices of expatriates and not determinative of a child's habitual residence.

On appeal, mother repeats her assertion that Mexico was only a temporary stop on the family's way around the world. However, the trial court expressly rejected this testimony as not credible, finding that, once the family established residency in

6

Ensenada, their intent to travel changed. Mother's reliance on her witness's testimony that the family's intention was to sail around the world is unavailing. The trial court gave the witness's testimony on this disputed fact little weight as the witness's knowledge of the parents' intent was more than five years old.

As stated above, our role is not to reweigh the evidence and decide whether the evidence supports a different conclusion than the one reached by the trial court. We are limited to a determination of whether the trial court's findings are supported by the record, which they are.

Also, mother has not cited to any legal error committed by the trial court that would warrant reversal. Mother argues that the trial court placed too much emphasis on the fact that the family lived in Ensenada for over the six-month period under the Uniform Child Custody Jurisdiction and Enforcement Act which defines a child's " '[h]ome state' " as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding." (Fam. Code, § 3402, subd. (g).) Without making any conclusions on the trial court's emphasis on the six-month period, the trial court clearly relied on other factors in making its determination that C.M.'s habitual residence was Mexico. These included C.M.'s enrollment in school and his socialization, as well as the parents' intent to remain in Mexico and their involvement in the local community.

Finally, mother's argument that the totality of the circumstances test articulated in *Monasky v. Taglieri*, *supra*, 140 S.Ct. 719 requires reversal is without merit. Because *Monasky* had yet to be decided, the trial court followed the Ninth

Circuit Court of Appeals's decision in *Mozes v. Mozes*, *supra*, 239 F.3d 1067, which emphasized the importance of the parents' mutual intent to establish a new habitual residence and abandon the old one, and the Sixth Circuit Court of Appeals's decision in *Friedrich v. Friedrich* (6th Cir. 1993) 983 F.2d 1396, 1401, which directed courts to focus on the past experience of the child, rather than the parents' future intentions. The trial court found under either standard that C.M.'s habitual residence was Mexico. Even though the trial court did not have the guidance of *Monasky* at the time of its decision, we conclude that it based its decision on all relevant circumstances. Nothing in the record suggests that remanding the matter back to the trial court to apply *Monasky* would result in a different outcome. A remand would only consume more time and thwart the Hague Convention's objective of a swift resolution to these custody disputes. (See *Monasky*, at p. 731.)

## DISPOSITION

The judgment is affirmed. No costs are awarded.
NOT TO BE PUBLISHED.



DHANIDINA, J.


We concur:



EDMON, P. J.



EGERTON, J.

8