# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 21, 2021

Lyle W. Cayce
Clerk

No. 20-30488

CHRISTOPHER RYAN HARM,

*Plaintiff—Appellant*,

*versus*

MESCHIYA RACHEL LAKE-HARM,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:19-CV-14662

Before WIENER, DENNIS, and DUNCAN, *Circuit Judges*.
WIENER, *Circuit Judge*:

Federal courts do not ordinarily decide custody disputes. But in rare instances, such as this one, such courts are called on to decide which country has jurisdiction over an international child-custody dispute.

## I. Introduction

Under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99–11 (Treaty Doc.) ("Hague Convention"), the country in which a child maintains his or her "habitual residence" almost always has jurisdiction to

No. 20-30488

decide a custody dispute between the parents of that child.[1] There are occasional situations, however, when a child moves to a new country but whose presence there is deemed "transitory."[2] In such circumstances, the country in which the child habitually resided prior to such move remains the child's *habitual residence*. That country is the jurisdiction of any Hague Convention custody dispute between such child's parents.

We must decide today if the district court clearly erred in deciding whether (1) a very young girl developed a habitual residence in Ireland or (2), as the district court concluded, her residence in Ireland was only transitory. The outcome we reach will determine whether Ireland (the residence of the father) or the United States (the residence of the mother and the child's habitual residence at the time of her birth there) will be the locale, and thus the source of the applicable law, of her parents' custody dispute.

The district court correctly applied the "totality-of-the-circumstances" analysis in determining the child's habitual residence, in accordance with the United States Supreme Court's most recent precedent on the Hague Convention.[3] There is a plethora of conflicting facts affecting the district court's ultimate holding, but perceiving no *clear error* in the district court's findings of fact or conclusions of law, we affirm.

## II. Factual Background

Petitioner-Appellant Christopher Ryan Harm is a citizen of the United Kingdom and Northern Ireland, currently residing in the latter.

---

[1] "Habitual residence" is not the same as residence or domicile. It is a term of art defined by and uniquely applicable to Hague Convention cases.

[2] *See Monasky v. Taglieri*, 140 S. Ct. 719, 726 (2020).

[3] *See id.* at 730.

2

No. 20-30488

Respondent-Appellee Meschiya Rachel Lake-Harm is a citizen of the United States, currently living in New Orleans, Louisiana. Mr. Harm alleged that their three-year-old child, SLH, was abducted by Ms. Lake-Harm from Ireland on May 21, 2019, when SLH was between one and two years old.

Ms. Lake-Harm is a professional musician. She met Mr. Harm in Germany or North Carolina — the parties dispute which[4] — while she was performing. At that time, Mr. Harm was living in Kilkenny, Ireland, and Ms. Lake-Harm was living in New Orleans. They both moved to New Orleans in November 2016 and were married in Mississippi that December. SLH was born to the couple in New Orleans on January 15, 2017.[5]

Because Ms. Lake-Harm frequently performed in Europe and because of "the political climate in the United States," she and Mr. Harm discussed setting up and maintaining a "home base" in Ireland for long enough that Ms. Lake-Harm could obtain European Union residency. (The couple had also become concerned about crime in New Orleans after a drug addict broke into their van and left a used hypodermic needle under SLH's car seat.) Both parents also wanted to give SLH the opportunity of living in the European Union and ultimately attending college there in the future if she so desired. Ms. Lake-Harm was interviewed by OffBeat Magazine, during which she explained that she could only live in New Orleans if she elected to live in the United States, but that she wanted to move to Europe so that SLH would have both United States and Irish passports.

---

[4] The parties disagree about this and a number of other facts. As we explain below, however, we must give credence to the district court's findings of fact.

[5] The parties also disagree whether they were living together when SLH was born or whether they were in a "long-distance relationship."

No. 20-30488

The couple began to experience marital difficulties in February of 2018, after which they slept in separate bedrooms. Ms. Lake-Harm kept traveling to perform, however, and did not cease her efforts to obtain European Union residency for herself and SLH. In May of that year, after spending time in New Orleans to sell some of her belongings, Ms. Lake-Harm took SLH to Amsterdam. Along with Mr. Harm, she and SLH traveled in the Netherlands, Switzerland, and Denmark for her performances. In June of 2018, Ms. Lake-Harm learned of sexual assault allegations against Mr. Harm, and the couple's relationship further deteriorated.

In July, two months after their arrival in Europe, the family moved to Ireland and rented the Woodview House outside of Cork, but Mr. Harm and Ms. Lake-Harm continued to sleep in separate bedrooms. Ms. Lake-Harm applied for and obtained an international driver's license. She deposited her funds in an Irish bank account and closed her United States bank account. She then legally added "Harm" to her last name, even though her marriage continued to crumble.

When Ms. Lake-Harm entered Ireland, she informed a customs official that Ireland was her new home. She also shared this information on her social media accounts. In one social media post, for instance, Ms. Lake-Harm proclaimed that, although "[t]he journey was an exhausting struggle," her new "home" was "worth it," and was "[p]erfect in every way." She said that she "never want[ed] to leave the Woodview House." In another post, she shared an article from the Irish Times with the headline, "I'm leaving a country devoid of compassion, for Ireland."

In March of 2019, Ms. Lake-Harm moved out of the Woodview House and into a house in Wexford, Ireland, approximately three hours away from the Woodview House, where Mr. Harm still lived. Following Ms. Lake-Harm's move to Wexford, the couple attempted to share custody of SLH.

An equal division was not often followed, however, because of Ms. Lake-Harm's frequent international travel, in which she would take SLH along. During that time, Ms. Lake-Harm expressed that Ireland was her "home base of operations."

The family traveled together to Italy in August of that year, but later Ms. Lake-Harm alone took SLH to the United States. Ms. Lake-Harm and SLH then traveled to Germany, where Mr. Harm was working at the time. While on that trip, the couple got into a dispute during which Mr. Harm attempted to take SLH from Ms. Lake-Harm forcibly. Ms. Lake-Harm became afraid: She told Mr. Harm that she wanted a divorce and that she could no longer co-parent with him. She consulted legal counsel in Ireland but was told that she could not file for divorce there because she was not a legal resident of Ireland.

Ms. Lake-Harm continued to travel with SLH, but no longer with Mr. Harm. However, Ms. Lake-Harm went to Greece in November and left SLH with Mr. Harm for six days. That was the first time SLH had been cared for overnight by Mr. Harm alone. When Ms. Lake-Harm traveled to Moscow, she again left SLH with Mr. Harm. But, after returning, Ms. Lake-Harm learned that Mr. Harm had been bathing naked with SLH and had taught her words for the male genitalia. After that, Ms. Lake-Harm no longer felt comfortable leaving SLH alone with Mr. Harm for more than a few hours at a time.

That December, after receiving permission from Mr. Harm, Ms. Lake-Harm took SLH to New Orleans to visit family and friends and to perform there. Ms. Lake-Harm and SLH returned to Ireland in mid-January 2019. SLH celebrated her January birthday in Ireland, but with no friends in attendance. (She had celebrated the same birthday with parties in New Orleans and Tucson prior to returning to Ireland.) With Mr. Harm's

permission, Ms. Lake-Harm continued to travel throughout Europe, accompanied by SLH. During that extended period of travel, SLH was in Ireland — together with Ms. Lake-Harm — for one-and-a-half weeks at the most.

Early in May of 2019, Ms. Lake-Harm began planning the above-noted move from Woodview House to Wexford, Ireland. Then, on May 21, Ms. Lake-Harm took SLH to the United States — originally with Mr. Lake's permission — planning to go to Tucson, Arizona and visit Ms. Lake-Harm's parents there. However, the mother and child ended up traveling to New Orleans instead.

### III. District Court Ruling

Mr. Harm then initiated the instant action in the Eastern District of Louisiana, claiming that Ms. Lake-Harm had abducted SLH, in violation of the Hague Convention. The district court ultimately held that SLH's habitual residence was the United States, and that her residence in Ireland was transitory. In its oral opinion and order, the district court considered testimony and arguments from both sides. The court based its finding that SLH's residence in Ireland was transitory partially on the fact that Mr. Harm had consented to all of SLH's travels, including the "abduction" in May 2019. That consent, the district court noted, was buttressed by Mr. Harm's knowledge that Ms. Lake-Harm maintained substantial ties to New Orleans and that SLH had been born there. The court also recognized that the couple had set up a base in Europe.

The trial court then discussed in detail, month-by-month, Ms. Lake-Harm's world-wide travel, almost always accompanied by SLH. The court noted that in every instance of travel, Mr. Harm consented to SLH going along with Ms. Lake-Harm. Testimony also established that, while in Ireland, SLH did not meet any friends or attend school. The court further noted that,

when SLH was in Ireland, she was never there "for more than a couple of weeks" before again traveling with Ms. Lake-Harm. The court concluded that SLH's ties to Ireland were "extremely limited."

The district court further found that Mr. Harm had not attempted to be in SLH's life very much. The court also noted the instability in the couple's marriage. Finally, the court summed up its holding by stating: "And now to say that [the couple] established habitual residence as a married couple and the parents of a minor child in Ireland under those circumstances would be absurd."

## IV. Standard of Review

The Supreme Court has observed that, for purposes of Hague Convention cases, "[a] child's habitual residence presents what U.S. law types a 'mixed question' of law and fact—albeit barely so."[6]

> The inquiry begins with a legal question: What is the appropriate standard for habitual residence? Once the trial court correctly identifies the governing totality-of-the-circumstances standard, however, what remains for the court to do in applying that standard . . . is to answer a factual question: Was the child at home in the particular country at issue? The habitual-residence determination thus presents a task for factfinding courts, not appellate courts, and should be judged on appeal by a clear-error review standard deferential to the factfinding court.[7]

"Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due

---

[6] *Monasky*, 140 S. Ct. at 730 (quoting *U.S. Bank N.A. v. Village at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018)).

[7] *Id.*

No. 20-30488

regard to the trial court's opportunity to judge the witnesses' credibility."[8] "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."[9] We may not "reverse the finding of the trier of fact simply because [we are] convinced that [we] would have decided the case differently."[10] "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."[11]

## V. Analysis

Although reasonable minds may disagree with the district court's conclusion, that court made a plausible finding in light of the record as a whole. We thus will not set it aside as clearly erroneous.[12] There is evidence that SLH might have established a habitual residence in Ireland. As noted above, the family discussed and took steps toward setting up a "home base" in Ireland to provide more opportunities to SLH. After the family's arrival in Ireland, Mr. Harm began taking SLH to the Sparks Toddler Group. The couple also applied for and was granted residency status for SLH. It would take SLH at least five years to get an Irish passport, but she got a Personal Public Service Number, allowing her access to Irish social services. The couple obtained a GP Visit Card for SLH to attend free medical appointments

---

[8] FED. R. CIV. P. 52(a)(6).

[9] *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

[10] *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985).

[11] *Id.* at 574.

[12] We note at the outset that the district court did make at least one error here: It noted post-removal facts, which the Hague Convention prevents courts from doing. This error, however, does not constitute clear error because there is ample evidence supporting a conclusion that SLH's residence after moving from the United States was transitory.

and checkups in Ireland and regularly saw doctors at the Grove Medical Centre in Cork.

Ms. Lake-Harm also applied for residency status and later obtained a Stamp 4 Visa and Personal Public Service Number, permitting her to work and file taxes in Ireland. The couple signed and filed an election form, electing to file taxes jointly in Ireland. Ms. Lake-Harm attested that she was "an ordinary resident of Ireland," and she obtained a European Union Health Insurance Card, providing her access to European Union social services. She purchased a vehicle in Ireland and registered and insured it there in her name.

Mr. Harm cared for SLH whenever he was given the opportunity, providing for her financially when she was with him. For example, SLH enjoyed horses so Mr. Harm took her for walks around the horse stables and for horseback rides near the Woodview House. And Mr. Harm's brother would visit Mr. Harm and SLH on weekends.

It is equally plausible, however, as the trial court concluded, that SLH's presence in Ireland was transitory. Ms. Lake-Harm's career as a professional musician sent mother and daughter on a dogged schedule of travel outside Ireland. SLH was Ms. Lake-Harm's constant companion on these tours as Mr. Harm gave permission for his daughter to begin traveling the world at three months old with her mother. This consent was given even as the relationship between Mr. Harm and Ms. Lake-Harm was crumbling. Far from setting up a new family home base in Ireland, the couple lived apart as they continued to experience marital difficulties. Ms. Lake-Harm did not even acquire the legal status she needed in Ireland to file for divorce. Ireland, for SLH, is a place where she spent only brief periods of her life without the company of friends or the normalcy of school. As evidenced by her lonely

birthday in 2019, it was just another stop on the well-traveled young child's worldwide travels.

## VI. Conclusion

We hold that the district court's determinations are plausible in light of the record as a whole. Despite the increase of SLH's parents' center of gravity in Ireland, we are obliged to follow the Supreme Court's precedent in Hague Convention cases such as this one.  When we do so — keeping in mind the trial court's unique position *vis-á-vis* the testimony of the witnesses and the other evidence — we must conclude that it did not commit clear error in determining and weighing the operative facts of this case.  Because that court determined, on the basis of all of the trial evidence, that SLH's presence in Ireland was transitory, the United States remains her habitual residence and its law governs this case. For the foregoing reasons, and given our highly deferential clear error standard of review, we cannot disturb the judgment of the district court. AFFIRMED.