# NO. 12-21-00074-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE 402ND* |
| *A.Y.S. AND A.H.S.,* | § | *JUDICIAL DISTRICT COURT* |
| *CHILDREN* | § | *WOOD COUNTY, TEXAS* |

## MEMORANDUM OPINION

M.Y.C.S. (Mother) appeals the trial court's order granting C.M.S.'s (Father) petition for the return of minor children, A.Y.S. and A.H.S., pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention") to Israel. We reverse and render.

## BACKGROUND

Father is an Israeli citizen and former Israeli diplomat; Mother is a United States citizen and traveling nurse whose permanent residence is in Wood County, Texas. Father and Mother met and married after a brief courtship in Florida in 2015.[1] Shortly thereafter, Mother became pregnant with twin daughters, A.Y.S. and A.H.S., via in vitro fertilization with the use of a donor's eggs and Father's sperm. While Mother was pregnant with the twins, Father's twelve-year old daughter from a previous marriage outcried to her counselor that Father spanked her with a belt. This ultimately led Father to return to Israel in February 2016. Upon his return, he was convicted in the Israeli courts of an offense related to spanking his twelve-year old daughter.

---

[1] Father contends in his brief that the parties were married in Israel while Mother contends in her brief that the parties were married in Florida. While the record does not definitively answer where the parties were married, it certainly suggests that the parties were married in Florida. The record contains substantial documentation that the parties were living in Florida in 2015 when they were married, and Father testified at trial that he and Mother stopped living together as husband and wife "[p]robably when I left the U.S. to return to Israel."

After returning to Israel, Father contacted Mother and told her they were no longer married under Jewish law because Father had conducted a background check and believed Mother was not Jewish. Mother, thirty-two weeks pregnant with the twins, nonetheless traveled to Israel on a three-month tourist visa. When Mother arrived in Israel, Father would not allow her to live in his home, so Mother stayed in a Rabbi's basement. Because Mother had no place to live in Israel, she attempted to return to the United States, but the airlines would not let her fly due to her advanced pregnancy. While Mother was visiting a doctor to be cleared to fly, she went into labor and the twins were born on June 20, 2016, approximately two weeks after Mother arrived in Israel from the United States. Father was not present for the birth of the children.

Despite the fact the twins were conceived via in vitro fertilization, Father requested a paternity test which confirmed he was the children's genetic father. On November 8, 2017, the parties signed an agreement to obtain a Jewish divorce and the court's orders set out Father's visitation and support for the children and provided that the children would be educated within the Israeli national school system and reside exclusively in Israel.[2] Thereafter, Father met and began exercising his visitation periods with the children. By this time, Mother and the children were living in a small apartment paid for by funds raised by a Rabbi. Mother, who had no personal items or work in Israel and was unable to speak Hebrew, told Father that she wished to return to the United States, which prompted Father to obtain "stay of exit" orders in Israel for each child in February 2018.

On April 29, 2018, Mother's visa was long expired, and the Israeli government ordered her to leave Israel within fourteen days. The twins were less than two years old, and Mother was still breastfeeding them. Mother obtained passports for the children through the American Embassy. On the application, Mother represented that no court had ever issued an order or decree that references the custody or travel of the children. Mother and the twins left Israel and returned to the United States in April 2018. Mother claims to have received no notice of the "stay of exit" orders from Israel and was allowed to return to the United States with her twins.

In May, Father filed a police report in Israel after he learned Mother left Israel with the children. According to Father, he worked with the Middle Eastern Affairs Department, the State

---

[2] Mother claims that the Israeli divorce court orders were not translated to English for her, even though the documents indicate her attorney translated them for her, and she did not know the substance of the orders.

Department, and a private investigator to locate his children after Mother left Israel. However, Father acknowledged having a copy of Mother's driver's license, which he requested upon meeting her for security reasons due to his status as a diplomat at the time, that listed her address in Wood County, Texas. Father also acknowledged that he did not contact Mother's parents during his search. According to Father, he did not want to alert Mother that he was looking for her for fear she would "take flight." Father maintained that Mother continuously moved around in Texas, used aliases, and failed to respond to correspondence from the U.S. State Department regarding the children.

According to Mother, since returning to the United States in 2018, she resided at her parents' residence in Wood County, Texas, but left the home to visit family for brief periods of time. Mother did not work when she returned to the United States so that she could be home with the children. Mother's family supported Mother and the children.

In August 2020, over two years after Mother and the children returned to the United States, Father, through his attorney, filed a petition for the return of the children pursuant to the Hague Convention and the International Child Abduction Remedies Act ("ICARA").[3] Mother filed an answer on September 9, setting forth a general denial of the allegations and the affirmative defenses that (1) the children are well settled in their new environment; (2) there is a grave risk that the children will be exposed to physical or psychological harm or otherwise placed in an intolerable situation should they be returned to Israel; (3) Father consented to alleged wrongful removal of the children under Article 13(a) of the Hague Convention; and (4) the return of the children should not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms under Article 20 of the Hague Convention.

Shortly thereafter, the trial court granted Mother's attorney's motion to withdraw as her counsel of record. Mother, acting pro se, filed a motion for continuance of the November 10 trial date so she that she could retain another attorney. The continuance was granted, and the matter was set for trial on January 6, 2021. On December 31, Mother's new attorney filed a notice of appearance and asked to continue the trial date to January 20, which was granted. On January 20, Mother's counsel announced "not ready" for trial and the trial court granted Mother's

---

[3] Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10494 (March 26, 1986); International Child Abduction Remedies Act, 22 U.S.C. §§ 9001-9011.

counsel's verbal motion to withdraw as Mother's counsel. The trial court reset trial to January 22. On January 21, the trial court denied Mother's motion for a continuance which requested a one-week continuance of the January 22 trial date to obtain a new attorney. Mother represented herself at the trial on January 22. On January 25, the trial court entered an order granting the Father's petition and ordering the return of the children to Israel. The trial court also awarded $7,500 in attorney's fees and $14,409.51 in expenses to Father. The trial court entered written findings of fact and conclusions of law. On April 30, the trial court held a hearing on Mother's motion for new trial, which it denied. This appeal followed.

## THE HAGUE CONVENTION

In Mother's third issue, she argues that the trial court erred by using the wrong standard to determine the children's habitual residence. Mother contends that the trial court erroneously applied the now abrogated "shared intent" standard instead of the "totality of the circumstances" standard adopted by the Supreme Court in *Monasky v. Taglieri,* __U.S.__, 140 S. Ct. 719, 723, 206 L. Ed. 2d 9 (2020). Mother contends that the trial court relied on Father's trial brief and focused on the parties' "shared intent" and, had the trial court applied the correct totality of the circumstances standard, it would have denied Father's petition to return the children to Israel. According to Mother, the trial court's findings of fact and conclusions of law demonstrate that the trial court did not consider the totality of the circumstances in rendering its decision. Father counters that, although the trial court began with the shared intent of the parties, the trial court's findings of fact and conclusions of law show that it reviewed all of the evidence presented to determine the children's habitual residence.

In her fourth issue, Mother argues that, under the totality of the circumstances, the trial court erred in finding Israel was the children's habitual residence. Father argues that, even if the trial court utilized the wrong standard, the record is well developed and the totality of the circumstances favors the trial court's findings.

**Standard of Review and Applicable Law**

In 1980, the Hague Conference on Private International Law drafted the Hague Convention with the overall goal "to address the problem of international child abductions

4

during domestic disputes."[4] ***Smith v. Smith***, 976 F.3d 558, 561 (5th Cir. 2020) (quoting ***Lozano v. Montoya Alvarez***, 572 U.S. 1, 4, 134 S. Ct. 1224, 1228, 188 L. Ed. 2d 200 (2014)); Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10494 (March 26, 1986). The ICARA codifies the United States' obligations under the Hague Convention, providing that courts are "to determine only rights under the Convention and not the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4). Procedurally, the Hague Convention attempts to accomplish its goal through "the prompt return of a child wrongfully removed or retained in any way from the country in which she habitually resides." ***Smith***, 976 F.3d at 561. It is then up to courts of the "habitual residence" of the child to decide the substantive merits of the underlying custody issue. ***Id.*** at 562.

Pursuant to ICARA, the Hague Convention petitioner bears the initial burden of establishing by a preponderance of the evidence that his child "has been wrongfully removed or retained within the meaning of the Convention." ***In re J.J.L.-P.***, 256 S.W.3d 363, 368 (Tex. App.—San Antonio 2008, no pet.); 22 U.S.C. § 9003 (e)(1)(A). A removal or retention is wrongful when it is in breach of rights of custody attributed to a person either jointly or alone, under the law of the State in which the child was habitually resident immediately before the wrongful removal or retention, and, at the time of the wrongful removal or retention, the petitioner was actually exercising those rights or would have but for the wrongful removal or termination. ***J.J.L.-P.***, 256 S.W.3d at 368. Once a petitioner establishes that a wrongful removal or retention has occurred, the child must be repatriated unless the respondent establishes that any of the Hague Convention's affirmative defenses apply. ***Id.***

The Hague Convention's central operating feature is the return of the child. ***Lozano***, 572 U.S. at 5, 134 S. Ct. at 1228. But the return remedy is not absolute. ***Id.*** Article 13 excuses return, where, for example, the left-behind parent was not "actually exercising" custody rights when the abducting parent removed the child, or where there is a "grave risk" that return would "place the child in an intolerable situation." ***Id.*** Article 12 of the Hague Convention states the general rule that when a court receives a petition for return within one year after the child's

---

[4] The United States and Israel are both signatories to the Convention. Hague Convention, Status Table, *available at* https://www.hcch.net/en/instruments/conventions/status-table/?cid=24.

wrongful removal, the court "shall order the return of the child forthwith." *Id.* Article 12 further provides that,

> where the proceedings have been commenced after the expiration of the period of one year [from the date of the wrongful removal], [the court] shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

*Id.* Thus, in some cases, failure to file a petition for return within one year renders the return remedy unavailable. *Id.*

Separating the procedural questions of international law from the substantive issues of the underlying custody issue has presented challenges to courts, especially because the Hague Convention's procedural mechanisms remain undefined. *Smith*, 976 F.3d at 562. Such is the case with the term "habitual residence." *Id.* Recently, the United States Supreme Court issued an opinion "to clarify the standard for habitual residence" and to "resolve a division in Courts of Appeals over the appropriate standard of appellate review." *Monasky*, 140 S. Ct. at 725-26. In doing so, the Supreme Court held the determination of the child's habitual residence does not "turn on the existence of an actual agreement" between the parents on where to raise their child. *Id.* Relying on the Hague Convention's explanatory report, negotiation and drafting history, and other treaty partner's standards, the court held "[t]here are no categorial requirements for establishing a child's habitual residence;" instead, a child's habitual residence "depends on the particular circumstances of each case." *Id.* In *Monasky*, the Supreme Court held that the determination of a child's habitual residence depends upon the totality of the circumstances particular to the case, but a child's residence in a particular country can only be deemed habitual when her residence there is "more than transitory." *Id*. at 723, 726.

Further, the Supreme Court held that the habitual residence determination presents a missed question of law and fact, "albeit barely so," explaining that:

> The inquiry begins with a legal question: What is the appropriate standard for habitual residence? Once the trial court correctly identifies the governing totality-of-the-circumstances standard, however, what remains for the court to do in applying that standard, as we explained, is to answer a factual question: Was the child at home in the particular country at issue?

*Id.* at 740, 730 (internal citations omitted). "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due

6

regard to the trial court's opportunity to judge the witnesses' credibility." ***Harm v. Lake-Harm***, 16 F.4th 450, 455 (5th Cir. 2021) (quoting FED. R. CIV. P. 52(a)(6)). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." ***Id.*** (quoting ***U. S. v. U.S. Gypsum Co.***, 333 U.S. 364, 395, 68 S. Ct. 525, 541, 92 L. Ed. 746 (1948)). We may not reverse the finding simply because we would have decided the case differently; instead, we reverse only where there are two permissible views of the evidence, and the trial court's choice between them was clearly erroneous. ***Id.*** (citing ***Anderson v. City of Bessemer City***, 470 U.S. 564, 573, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985)).

## Habitual Residence Determination

As previously discussed, the trial court must consider the totality of the circumstances when determining a child's habitual residence under the Hague Convention. ***Monasky***, 140 S. Ct. at 725-26. A petitioner must prove the following to establish a prima facie case of wrongful removal: (1) the child was habitually resident in the petitioner's country at the time of removal, (2) the removal was in breach of the petitioner's custody rights under the law of his home state, (3) and the petitioner had been exercising those rights at the time of removal. *See **Abbott v. Abbott***, 560 U.S. 1, 9, 130 S. Ct. 1983, 1989, 176 L. Ed. 2d 789 (2010).

### *The Parties' Arguments*

Father acknowledges that the trial court did not specifically cite to the totality of the circumstances standard, but counters that the record was well developed and the "Supreme Court's ruling in ***Monaksy*** actually favors affirming the judge of the trial court below." Father points to the following list of facts to support the trial court's habitual residence finding:

1. The parties married in Israel and resided there at the time of the children's birth.
2. The parties had no intentions of living in the United States.
3. The children were born in Israel.
4. The children were to be educated within the national religious school system and reside exclusively in Israel.
5. The parties never shared any intention to abandon Israel and establish the United States as the children's habitual residence.
6. The parties were divorced in Israel, and as part of the divorce agreement, the children were to reside in Israel.
7. The Rabbinical Court ratified the aforementioned divorce agreement which determined where the children were to reside.

Father also urges this Court to "follow the [United States] Supreme Court's position to simply affirm the trial court, rather than remand, to dispose of this case expeditiously." Father argues that the twins' time in the United States was no more than transitory because (1) Mother made the unilateral choice to relocate the children; (2) Mother abducted the children from Israel and moved them to the United States in violation of the parties' divorce agreement, which the Rabbinical Court in Israel had approved, and in violation of Israeli court orders; (3) the parties never contemplated or discussed abandoning Israel as their home; (4) Mother was not employed in the United States at the time of trial; and (5) the children lived in multiple locations with Mother in the United States, including a structure she was renovating, which indicates Mother and the children did not have a permanent home.

Father argues that, at the time of the abduction, the parties' and children's strong attachment was to Israel:

> Israel was a base for the family because of the family they had there and the only plans the parties had discussed prior to abduction was to live in Israel. At the time of the abduction, only father was employed, and he was employed in Israel. Prior to abduction, mother had taken steps to obtain citizenship or permanent residency in Israel. Despite Mother's testimony to the contrary, her actions and the parties' shared intentions prior to abduction all weigh in favor of determining that her and the children's stay in the U.S. was only temporary.

Father further argues that (1) "there is no concrete evidence" that the children socialized with anyone outside the family, made friends, or engaged in extracurricular activity or lessons; (2) the children only obtained United States passports because Mother falsified the applications; (3) the children were not at home in the United States, never acclimated to the culture or the language, and had no strong enduring ties to their community in the United States; (4) the parties maintained no shared intent to abandon Israel and supplant it with the United States; (5) his employment is in Israel and he "ostensibly" maintained his financial accounts in Israel; (6) there "is no evidence in the record that at the time of abduction the parties owned any real property in the United States;" and (7) "[l]ooking at all of the facts and evidence presented to the trial court, and the determination of the trial court based on the record and the evidence, no clear error exists."

Mother argues that the totality of the circumstances weighs in favor of the United States as the children's habitual residence and characterizes the twins' time in Israel as merely

"transitory." Mother notes that she initially wanted to raise the twins in Israel and traveled there when she was pregnant, only to be abandoned by Father, but when she attempted to leave Israel because of that abandonment, she was unable to do so because the airlines would not allow her to travel. Mother further notes that she went into labor while trying to obtain a doctor's approval to fly back to the United States, and but for that circumstance, the children would have been born in the United States. Additionally, Mother points out that she had only been in Israel for two weeks when she went into labor with nowhere to live and no support from Father. Mother argues that she had no personal effects, permanent home, job, or family in Israel, except for Father, who had nothing to do with her or the children for the first year of their lives. Mother contends that she does not speak Hebrew, that her divorce agreement was not translated, and when she was ordered to leave from Israel, she was the sole custodian of the nursing children.

*Analysis*

We begin by setting forth the trial court's factual findings in support of its judgment:

1. Petitioner and Respondent were married on January 20, 2015.
2. Arising from the marriage, Petitioner and Respondent have two children, [A.Y.S] and [A.H.S], born on June 20, 2016 in the State of Israel.
3. At the time of this proceeding, the children are under the age of 16 years.
4. Respondent voluntarily removed the children from the State of Israel to the United States, specifically Wood County, Texas, in May of 2018.
5. At the time of the children's removal, the habitual residence of the children was the State of Israel.
6. Prior to the children's removal, Petitioner and Respondent agreed in writing (the "divorce agreement") that the exclusive residence of the children would be the State of Israel.
7. Petitioner's joint right with Respondent to determine the residence of the children constitutes a "right of custody" as that term is defined in the Hague Convention on the Civil Aspects of International Child Abduction.
8. At the time of the children's removal, Petitioner was exercising his right of custody of the children.
9. Petitioner did not consent to or acquiesce in Respondent's removal of the children from the State of Israel.
10. Petitioner filed in this Court (the Proceeding), his petition for the return of the children to the State of Israel under the provision of the Hague Convention on the Civil Aspects of International Child Abduction.
11. The Proceeding commenced after the expiration of one year from the removal of the children from the State of Israel.
12. From the date of the children's removal by Respondent until the Trial of this Proceeding, Respondent intentionally limited Petitioner's access to the children.
13. At time of trial, Respondent was not employed.
14. At the time of trial, the children were not attending school.

15. Petitioner and Respondent's marriage was dissolved in the Tel Aviv Rabbinical Court on November 23, 2017 and the Get (Jewish Divorce Document) was registered in that Court on the same date.

16. At the time of the children's removal from the State of Israel through the date of trial of this Proceeding, the Tel Aviv Rabbinical Court has retained jurisdiction over the children.

The trial court's order also contains the following legal conclusions:

19. Respondent breached Petitioner's right of custody pursuant to the Divorce Agreement of the parties.

20. Respondent's removal of the children was wrongful.

21. Respondent failed to prove by a preponderance of the evidence that:
    (1) Petitioner was not exercising his rights of custody at the time of removal;
    (2) Petitioner consented or acquiesced in Respondent's removal of the children;
    (3) The children were well-settled in their environment in Wood County, Texas.

22. Respondent failed to prove by clear and convincing evidence:

    (1) That there is a grave risk that return of the children to the State of Israel would expose the children to physical or psychological harm or otherwise place the children in an intolerable situation;
     or
    (2) That return of the children would violate fundamental principles of the United States relating to the protection of human rights and fundamental freedoms.

23. The Petitioner has shown by a preponderance of the evidence that the children should be returned to the State of Israel, their habitual residence.

In reviewing the trial court's findings and conclusions, we look to *Monasky* for guidance on the resolution of the habitual residence determination. In *Monasky*, the mother, Monasky, a United States citizen, and the father, Taglieri, an Italian citizen, married in the United States in 2011 but moved to Italy in 2013. 140 S. Ct. at 724-25. After a year in Italy, Monasky became pregnant but the parties' marriage deteriorated, with Monasky alleging Taglieri was abusive. *Id.* Their child was born in Italy in 2015, and shortly thereafter, Monasky left Taglieri and returned to the United States with their infant. *Id.* Taglieri sought recourse in the Italian courts and successfully had Monasky's rights terminated. *Id.* Taglieri also filed a petition under the Hague Convention in the United States District Court for the Northern District of Ohio for return of the child to Italy. *Id.*

The District Court granted Taglieri's petition because, while Sixth Court precedent at the time instructed courts that a child habitually resides where the child has been acclimated to her

surroundings, an infant is too young to acclimate to her surroundings. *Id.* The District Court proceeded on the assumption that the shared intent of the parents is relevant in determining the habitual residence of an infant and found that Monasky and Taglieri intended to raise their child in Italy and ordered the child's prompt return. *Id.* Despite holding that a totality-of-the-circumstances, rather than a "shared intent," standard applied, the Supreme Court nonetheless affirmed the District Court's determination because it found that the District Court determined all the relevant facts, the parties agreed no further factual development was required, and neither party asked for a remand. *Id.* at 731. The Hague Convention's preference for "swift resolution" also favored a final decision. *Id.*

The Supreme Court reasoned that children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers; thus, the intentions and circumstances of caregiving parents are relevant considerations. *Id.* at 727. No single fact is dispositive across all cases. *Id.* Common sense suggests that some cases will be straightforward, for instance, where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence. *Id.* On the other hand, for instance, an infant who lived in a country only because a caregiving parent had been coerced into remaining there would be a relevant circumstance in the habitual residence determination. *See id.* An infant's "mere physical presence" is not a dispositive indicator of an infant's habitual residence. *Id.* at 729. But a wide range of facts other than an actual agreement, including facts indicating that the parents have made their home in a particular place, can enable a trier of fact to determine whether an infant's residence in that place has the quality of being "habitual." *Id.*

In this case, the only legally relevant "factual" circumstances the trial court considered in making its habitual residence determination are as follows:

1. Mother and Father were married in 2015.
2. Mother and Father are the parents of the children.
3. Mother agreed in writing that the children would reside in Israel.
4. Mother was not employed and the children were not attending school at the time of trial.

While the determination of the childrens' "habitual residence" presents a "mixed question" of law and fact, "albeit it, barely so," it is subject to "clear error" review on appeal. *Monasky*, 140 S. Ct. at 730. As Justice Alito noted in his concurrence:

So interpreted, 'habitual residence is not a pure question of fact, at least as we understand that concept in our legal system. But it does involve a heavily factual inquiry. For these reasons, I would say that the standard of review is abuse of discretion, not clear error. As a practical matter, the difference may be no more than minimal. The important point is that great deference should be afforded to the District Court's determination.

*Id.* at 735 (Alito, S., concurring). Moreover, the Texas Supreme Court has stated that "[w]ith regard to factual questions, the abuse of discretion standard is more akin to a clear error standard." *In re J.B. Hunt Transp., Inc.*, 492 S.W.3d 287, 294 (Tex. 2016).

The trial court was required to look to the totality of the circumstances before the removal to determine the children's habitual residence. *See Monasky*, 140 S. Ct. at 725-26; *see also Abbott*, 560 U.S. at 9, 130 S. Ct. at 1989. Therefore, the circumstances that existed at the time of removal are the circumstances that were relevant to the trial court's inquiry. *See Monasky*, 140 S. Ct. at 725-26; *see also Abbott*, 560 U. S. at 9, 130 S. Ct. at 1989. Thus, Mother's employment status and Father's allegations that Mother lacks a permanent home are not relevant to the initial habitual residence inquiry. *See Monasky*, 140 S. Ct. at 725-26; *see also Abbott*, 560 U. S. at 9, 130 S. Ct. at 1989. Moreover, we note that Mother disputes the allegation that she lacks a permanent home, as she testified that she is financially supported by her parents in Wood County, Texas, and lives at their home. Furthermore, Father's characterization of the evidence is misleading. Father explained his actions at trial during cross examination by the Mother:

Mother: So when was the first time that – that you acknowledged the twins and –and started providing for them?

Father: I acknowledged the twins as being mine from the very beginning. I just wanted to make sure that they were indeed mine because of the religious issues that I presented if they were not my children.

Mother: So isn't it true that you did not – you did not acknowledge them for over a year? You did not have anything to do with them for over a year?

Father: I was under a very extreme emotional crisis when I discovered that I had been married to a woman who was not Jewish. That goes against everything that I believe in. And if -- and it's -- and I felt that -- I felt raped because I -- please. Please. This is important for you to understand.

Mother: Okay.

Father: I felt that I had become intimate with a woman that I would never have had a relationship with had I known who she really was. I had to separate myself from you for my own emotional health. But I did everything that I was asked to do by the Court.[5]

Father discusses "the parties' intent," but the record makes clear that, after Father returned to Israel, he considered himself "not married" to the Mother and questioned the paternity of the twins, despite the fact they were conceived via in vitro fertilization.

And while Mother did sign the Israeli custody agreement, she contends that she did not understand the agreement because it was not translated for her. Regardless of whether Mother knew the contents of the agreement, we agree with Mother that the Israeli court orders do not, in isolation, establish habitual residence, but are simply a relevant circumstance to be considered. *Monasky*, 140 S. Ct. at 725-26; *see also Smith*, 976 F.3d at 563.

Importantly, our review of the record reveals relevant circumstances, which are conclusively established in the record, that the trial court evidently did not consider in its determination:

1. Mother and Father met in the United States and Mother became pregnant with the twins in the United States by in-vitro fertilization.
2. Father left the United States and returned to Israel alone, without Mother, who was already pregnant with the twins.
3. Father filed for divorce from Mother shortly after returning to Israel and notified Mother that he did not consider their marriage valid.
4. Father knew Mother would not qualify for citizenship under the law of return in Israel and told her not to come to Israel until "its straightened out."
5. Mother went to Israel at 32 weeks pregnant and Father would not allow her to live with him.
6. Father provided Mother with no financial or other support when she arrived in Israel.
7. Mother had no permanent residence in Israel and could not obtain employment.
8. Mother attempted to return to the United States two weeks after arriving in Israel, but the airlines would not let her fly due to her advanced pregnancy.
9. Mother was trying to obtain a doctor's permission to fly when she went into labor with the twins and delivered the twins in Israel, approximately two weeks after Mother arrived in Israel.
10. Father did not attend the birth, nor did he meet the children until they were over a year old after paternity testing, which he requested, confirmed he was the genetic father.
11. Mother is not proficient in Hebrew, the official language of Israel.
12. The Israeli decree states that "mother shall have custody of the daughters" and "father shall be entitled to receive the daughters, as of the signing of this agreement, twice a week (currently once a week), on Mondays and Thursday, between the hours of 16-19." The orders require Father's visitation to be supervised by a Dr. Daniel Gottlieb since "the father desires to

---

[5] Text messages offered by Mother at the motion for new trial confirm that Father abandoned Mother and told her he considered himself not married to her because she was "not Jewish" prior to her arrival in Israel.

13

increase visitation arrangements, including sleepovers, and to spend time with them without the presence of the mother."

13. Mother was ordered to leave Israel when the twins were approximately twenty months old and still breastfeeding.

We are mindful of the standard of review in this case, but after considering the totality of the circumstances, we are left "with the definite and firm conviction that a mistake has been committed." *Harm*, 16 F.4th at 455. Here, the only factors that weigh in favor of finding Israel is the children's habitual residence are, essentially, the fact that they were born in Israel and were subject to Israeli court custody orders. However, we must consider all of the circumstances, which in this case are quite extraordinary.

Because the children were only twenty months old and still nursing, the intentions and circumstances of Mother and Father are relevant considerations. *See Monasky*, 140 S. Ct. at 727. First, we note that Mother attempted to return to the United States before the birth but was unable to do so because the airlines would not let her fly. Mother went into labor with the twins while attempting to obtain permission to fly so that she could return to the United States. After the children were born, they resided exclusively with Mother for the first year of their lives in a small apartment in Israel. Mother had no social or financial support from Father during this time. Mother does not speak Hebrew and is a United States citizen. The children did not have any contact with Father or his extended family in Israel except for supervised visitation that occurred a few times a week during the last five months during their stay in Israel. Father's assertion that Israel was "a base for the family because of the family they had there and the only plans the parties had discussed prior to abduction was to live in Israel" is not supported by the record. Only Father had family in Israel, Mother had no other ties to Israel besides Father. While Mother admits that, at one time, she wished to raise the children in Israel with Father, it is clear that the parties had no "shared" intent with respect to where to raise the children once she arrived in Israel. Moreover, Mother described her time in Israel as follows:

> When he went to Israel and went through what he was going through, I wanted to go there to support him. And even if he did want the marriage to be dissolved, I wanted to raise my children there. And when I got there, even though we were still married, I was -- I was -- I was treated so badly. I was given a tourist visa at 32 weeks pregnant, still wearing our wedding ring, still married.

14

I mean, when I gave birth in the hospital, I had nobody there with me to translate the consents that I signed or to tend to the girls who were born at 34 weeks and had to go to NICU. They didn't have their father there.

He ordered -- he told the hospital that I had mental issues; that I had traveled, you know, pregnant, and all this stuff. I had to go through a mental evaluation two days after giving birth to twins via C-section – emergency C-section.

I knew that I didn't have a home to go to when we first arrived, that he wouldn't allow us to come home. I slept on a cot in my rabbi's basement, and my little boy slept on a blanket on the floor.[6] I knew that they would not let preemies leave the NICU without a social worker going and making sure that their home was set up and ready for them.

And my Rabbi was so awesome, he, with my permission, made our story known worldwide to the Jewish community and was able to raise money to get a little apartment for us and -- and a little bed for the girls and baby clothes. And when I was there, I had none of my personal items. Everything was still in America. It was -- it was the most frightening and wonderful time of my life. I had the most beautiful babies, but I was so unbelievably sad.

I was not allowed to work. I made so many trips trying to get copies of their birth certificates and just trying to make my way in a country that I was rendered blind, deaf, and mute because I couldn't speak the language.

And I kept on trying until I realized that I was not going to be allowed to stay, we were not going to be able to make Israel our home. And with the help of the American Embassy, they kept telling me what they needed next, and I would just wait until, you know, I got the paper from the courts and -- and I got the birth certificates -- I didn't even get their birth certificates until they were almost five months old.

And I thought that if I contacted him and asked him to meet the girls, that it would soften his heart and that he would start helping us be able to have a home and have a life in Israel. And it didn't.

And he never -- he wants to talk about how Israel would give me, you know, this modified citizenship and all this stuff. Why didn't it happen when I was there?

And did I -- did I abduct my children? What kind of mother would leave her breast-feeding babies behind? No. I chose to follow the order to return home, to leave the country.

While Father may be home in Israel, the record makes clear that Mother was not. In *Monasky*, the mother and father moved to Italy as a couple, and resided there for two years prior to the birth of their child. 140 S. Ct. at 724-25. The relationship between the mother and father did not deteriorate until after the couple moved to Italy. *Id.* Here, Father abruptly returned to Israel alone, because allegations of abuse against his older daughter became public. After he returned to Israel, Father considered himself "not married" to Mother for religious reasons. Mother went to Israel to be with Father, but he rejected her. Mother attempted to return to the United States prior to the birth of the children but was unable to board a plane due to her pregnancy. Mother gave birth to the children two weeks after she arrived in Israel while at the

---

[6] Mother has a school-aged son and several adult children from prior relationships.

doctor attempting to obtain a doctor's release to fly home to the United States. After the children were born, Father questioned their paternity despite the circumstances surrounding their conception. Father had no contact with the children for the first year of their lives and only exercised supervised visitation with the children for the five months preceding their removal. Thus, the children were almost exclusively in the care of the Mother while in Israel. For the above reasons, we conclude the children had no real integration into a social or family environment in Israel. *Monasky*, 140 S. Ct. at 726.

Therefore, we sustain Mother's third and fourth issues, and hold, based upon the totality of the circumstances, that the trial court erred in concluding that the children's habitual residence is Israel. We further hold that the children are habitually resident in the United States. *See id.* Because we conclude that the trial court erred in ordering the return of the children to Israel, we also sustain Mother's seventh issue, in which she challenges the trial court's award of attorney's fees, costs and expenses. *See* 22 U.S.C.A. § 9007.

## DISPOSITION

Having sustained Mother's third, fourth, and seventh issues, we *reverse* the trial court's judgment and *render* judgment that Father's petition for return of the children be *denied.*[7] All pending motions are *overruled as moot*.

**GREG NEELEY**
Justice

Opinion delivered March 23, 2022.
*Panel consisted of Hoyle, J, and Neeley, J.,*
*Worthen, C.J., not participating.*

---

[7] Having sustained Mother's third, fourth, and seventh issues, we have granted the requested relief and need not address her first, second, fifth, and sixth issues, in which she argues that the trial court violated her rights to due process, Father only had rights of access but not rights of custody, and that she established either the well-settled or grave harm defense. *See* TEX. R. APP. P. 47.1.



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MARCH 23, 2022**

**NO. 12-21-00074-CV**

**IN THE INTEREST OF A.Y.S. AND A.H.S., CHILDREN**

Appeal from the 402nd District Court
of Wood County, Texas (Tr.Ct.No. 2020-394)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this Court that there was error in judgment as entered by the court below and that same should be reversed and judgment rendered.

It is therefore ORDERED, ADJUDGED and DECREED by this Court that the judgment of the trial court in favor of Appellee, C.M.S., be, and the same is, hereby **reversed** and judgment **rendered** that the Appellee, C.M.S.'S, petition for return of the children be **denied**. All costs in this cause expended both in this Court and the trial court below be, and the same are, adjudged against the Appellee, C.M.S., for which let execution issue; and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Hoyle, J. and Neeley, J.,*
*Worthen, C.J., not participating.*

17